## GENERAL ELECTRIC CO. v. CAMPBELL.

(Circuit Court, D. New Jersey. May 12, 1905.)

1. PATENT—DEMURRER—WHEN SUSTAINABLE.

A demurrer to a patent can be sustained only when the question of invention is free from doubt. There must be in the mind of the court an absolute conviction of the lack of invention, and if there is any doubt on this point the case must be decided adversely to the demurrant.

[Ed. Note.—For cases in point, see vol. 38, Cent. Dig. Patents, § 536.]

2. SAME—LAMPS.

Demurrer to patent No. 726,293, for new and useful improvements in exhausting lamps, overruled.

(Syllabus by the Court.)

In Equity.

Richard N. Dyer and John Robert Taylor, for complainant.
A. Parker-Smith, for defendant.

CROSS, District Judge. The bill of complaint alleges infringement of letters patent No. 726,293, granted to one John W. Howell, and assigned to the complainant. The defendant has demurred to the bill; assigning for cause that said patent is void, in law, for lack of patentable invention and novelty.

Various reasons have been given by the courts in justification of the practice of questioning the validity of a patent by a demurrer, but it is unnecessary to refer to these, since the practice has long been thoroughly well established. It is likewise clearly well settled that a demurrer can be sustained in such cases only where the question of invention is free from doubt. There must be in the mind of the court an absolute conviction of the lack of invention. If there is any doubt whatever on this point, the case should be decided adversely to the demurrant. Moreover upon demurrer the court will consider only matters shown upon the face of the patent, and matters of common and general information, known to the court to be reliable, and to have been published prior to the application for the patent. Among the many authorities supporting these views are American Fibre-Chamois Co. v. Buckskin Fibre Co., 72 Fed. 514, 18 C. C. A. 662; Indurated Fibre Industries Co. v. Grace (C. C.) 52 Fed. 128; Dick v. Oil Well Supply Co. (C. C.) 25 Fed. 105; Lyons v. Drucker, 106 Fed. 416, 45 C. C. A. 368.

The patent in suit is for "new and useful improvements in exhausting lamps," and the patentee's method of doing this can best be given in his own language:

"My present invention relates to the manufacture of incandescent electric lamps, and particularly to the now well-known chemical processes of exhausting the bulb. These processes have come into some use, and they depend for their utility upon the fact that the ordinary mechanical or mercurial pumps are incapable, without considerable expense of time, of obtaining the necessary perfection in the vacuum which is required for any extended life of the filament. In order to save the extended treatment necessary under the pump, the chemical processes referred to have been used; they consisting in introducing within the vacuous inclosure, and generally within the same tube which is used in exhausting, and which is afterward sealed off in making the

completed lamp, a chemical which will readily combine, when heated, with the remnant of gases which are released during the final incandescence of the filament in the process of manufacture. In the ordinary ways of using these processes, the selected chemical is placed in the tubulature of the lamp. After the vacuum is obtained as far as desired by mechanical means, the tubulature is sealed below the chemical. The filament is then brought to intensive incandescence, and the chemical heated to drive vapors in the lamp-bulb, which by combination perfect the vacuum. The tube is then sealed above the chemical, or between it and the lamp; the superfluous portion of the tube being, as usual, cut off. The process thus outlined is, however, open to some objections. Among others, it is found that the application of heat to the tube in the first sealing is apt to volatilize too much of the chemical; introducing too much vapor within and tending to discolor the bulb of the lamp. The moment of best exhaustion by the mechanical pump must also be seized to perform the first sealing off of the lamp. This, however, is a definite moment, while the sealing occupies several seconds, at least. In addition, there is more or less loss from collapse of the tubes, permitting air to leak into the bulb. These objections are obviated by the improved method of exhaustion which I adopt. In this I connect the lamp-bulbs, as usual, to the mechanical pump; but I employ for the purpose a piece of very thick and substantial rubber tubing, which is slipped over the pipe leading to the pump, and into the end of which the lamp-tubulature is inserted after the chemical has been placed in the latter. I find this a convenient and reliable form of connection, which is capable of being closed with promptness by an ordinary pinch-cock, and one which will maintain the vacuum unimpaired long enough to effect the final exhaustion of the lamp by chemical means. It is, of course, understood that, so long as the connection to the pump is open, it is difficult to obtain a proper vacuum in the bulb. After the connection to the pump is closed, the lamp-filament is brought to incandescence, the chemical being, if necessary, also heated slightly; but as this operation is, in my process, practically independent of sealing, it may be performed with some exactitude. The tube is then sealed off, and the lamp is completed in the usual way. The essence of my invention therefore consists in the closing of the connection between the lamps and the pump without the use of heat, so that an excess of the chemical used to perfect the vacuum is not volatilized. It consists, also, in the detail of the process by which I am enabled, in addition to the advantages already pointed out, to perform the sealing operation much more expeditiously, and with a saving in the amount of tube necessary under the old process."

There are three claims in the patent, somewhat variant, but, as connected with the invention under consideration, they are limited in the first claim to "closing the pump connection below the chemical without the use of heat"; in the second claim, to "closing the pump connection below the chemical without heating the tube"; and, in the third claim, to "closing the connection between the pump and the bulb without the aid of heat." Thus all of the claims state the invention to consist substantially in closing the connection between the air pump and the bulb without the aid of heat, which appears from the specifications to have been the former method of treatment. The patentee does this by means of a piece of very thick and substantial rubber tubing, instead of glass tubing, which rubber tubing is capable of being quickly closed by an ordinary pinch-cock. The means used are undoubtedly very simple, and both of the elements are old, and probably have been used, and often used, in combination before, but for a purpose entirely different. From the specifications, there would seem to have been various objections to the prior method of closing the tube by heat, and it is not improbable to suppose that this method had become so

common and well recognized as to create the impression that it could not be done cheaply, conveniently, or quickly otherwise. Whether this be so or not, however, can only be definitely ascertained by evidence; but, if true, the use of the rubber tube and a pinch-cock were so remote from their former use, and from the former method adopted for closing the tube, that a new idea was suggested, which appears to involve invention. It certainly seems novel to use rubber tubing as an element, instead of glass tubing, in a place where intense heat had hitherto been applied. The use of rubber tubing under such circumstances certainly was not obvious. In Western Electric Co. v. La Rue, 139 U. S. 601, 11 Sup. Ct. 670, 35 L. Ed. 294, a torsional spring, such as had been previously used in clocks, doors, and other articles of domestic furniture, was applied to telegraphic instruments; and, its application thereto having been shown to be wholly new, the patent was held valid.

The application for the patent in suit was filed November 9, 1897, and the patent was issued April 28, 1903. The matter, therefore, was before the Patent Office for a number of years, and undoubtedly received careful consideration at the hands of the examiners. Possibly numerous objections were raised by them and answered before the patentability of the invention was finally demonstrated. Whether any such objections were made or not, we do not know. We do know, however, that the patent was finally issued, and that its issuance is prima facie evidence of novelty and invention. On the determination of the question raised by this demurrer, there is, of course, no evidence for our consideration. We know nothing of the prior art, and nothing as to the practical working and general utility of the device. We are called upon to decide the question without such knowledge as evidence of the above character might and probably would impart. If the bill is summarily dismissed, the complainant is denied the right to support by evidence the presumption of novelty and invention which arises from the issuance of the patent. We are not able to say that the want of invention and novelty is so apparent that no possible evidence could be adduced to show the contrary. It is not a clear case, free from doubt. We are not convinced that the patent does not disclose invention.

The demurrer is overruled.